All right, our third case is number 19-10950 PDSVA US Litigation Trust v. Lukoil Pan Americas, LLC. Mr. Boies, whenever you're ready. Thank you, Your Honor, and may it please the Court. My name is David Boies, and I represent the plaintiff, the Pettivessa Litigation Trust. Although the parties in this case differ considerably in their characterization of the facts, the essential facts are basically undisputed. In 2016, lawyers and investigators trying to figure out why certain American companies were being repeatedly shut out of doing business with Venezuela's national oil company, Pettivessa, uncovered extensive evidence of a long-running bid rigging and embezzlement scheme that had looted and was continuing to loot billions of dollars. That evidence, which is summarized in the complaint filed in this action, included not only the names of the conspirators, the structure of the conspiracy, and how the conspiracy worked. It also included bank records, code names, and documents that traced the flow of funds. In 2017, Pettivessa was approached with this evidence. Pettivessa and Venezuelan government officials responsible for Pettivessa agreed to try to stop the scheme. They also said that if the lawyers and investigators would undertake the litigation on a contingency basis, they wanted to try to recover the looted funds. Pettivessa could have sued itself as the plaintiff. However, there was a recognized culture of corruption in Venezuela that infected all political factions, and everyone knew that the conspirators, who were well-funded and well-connected, would use all of their influence to try to derail the litigation once they learned of it. The legal fees and expenses of pursuing this litigation could easily exceed $50 million to $100 million. No lawyer or funder would undertake making such an investment, only to have Pettivessa or the Venezuelan government later drop the case as a result of political considerations or further corruption. To solve this problem, it was agreed... Mr. Boies, we're pretty familiar, I think, with the underlying allegations, and you don't have much time, and the district court never got to the merits of your complaint, so you may want to turn to some of the issues that you need to have us resolve in your favor if you're going to proceed. One of the issues that they raised, Your Honor, is, for example, what the purpose of this trust was. And the purpose of this liquidating trust was to be sure that this litigation could proceed. The only beneficiary of this trust is Pettivessa, and two of the three trustees were American citizens, only one appointed by Pettivessa, so that it was clear that this could be something that could not be stopped as a result of political corruption. This action was taken in 2017. The trust was formed in 2017 at a time when President Maduro and his administration were the sole recognized government of Venezuela. Relations were strained between the United States and Venezuela, but at that time, neither Maduro nor his administration were even subject to U.S. sanctions. At that time, there was one government of Venezuela, and it was that government that acted to transfer Pettivessa's claims to the litigation trust. Mr. Boies, let me ask you a question, if I could, please. This is Judge Jordan. Yes. With regard to the act of state doctrine, which you say cuts in your favor, because at the time that the trust was created, the recognized government of Venezuela was the one that went forward to allow the creation of the trust, but to what extent does the act of state doctrine allow or require a court to figure out whether or not a government official had the authority to act? So, for example, if you had, let's say, a lower-level engineer with Pettivessa authorizing the trust to be created, would a court be required to find out whether, under Venezuelan law, that petroleum engineer could authorize the creation of the trust? Not if the government of Venezuela, and here you have the oil minister of Venezuela and the attorney general of Venezuela. Right, but how do we know that those two individuals, in their official capacities, are able to bind Pettivessa? What is important is that the act of state doctrine says that the government of Venezuela gets to make that determination. That is not a determination for the U.S. courts to make. Once the government of Venezuela takes the position that these people are authorized, and these people were the government of Venezuela, this was the minister of oil and it was the attorney general of Venezuela, people may say they shouldn't have been there, but they were there. And in 2017, there was no challenge by the United States to the Maduro government. President Juan Guaido was only appointed in January of 2019. That was the first time that the United States had ever suggested that Mr. Maduro was not the lawful legitimate president. This is Judge Anderson with a question. I have the same concern. I am pretty sure that the act of state doctrine does not apply at all if Martinez did not have authority to perform this act. And I have seen no evidence in this record of any authority, no evidence that just because he's the oil minister that he has authority to convey the assets of this wholly owned corporation. It was undisputed that the oil minister was the person that was responsible for Pettivessa. I don't believe it is undisputed. What is the evidence that he has authority without an act of the, without a resolution of the board of directors, without an officer of the corporation? What evidence is that the oil minister had authority to convey assets of a wholly owned corporation? The laws of Venezuela were introduced. And one of the problems with what happened below, Your Honor, is that the court never made an independent examination of what the law was. If the court was going to have to look at whether the oil minister or the attorney general were acting properly or not under the law, that was never done. Indeed, all the magistrate did, the judge did, was to recite what the different experts concluded and said it was an equipoise. I realize the district court went off on authentication rather than authority. Yes. Although he seemed to be influenced by the lack of authority. But I think you have a problem both with authentication and with authority. With respect to authority, that was, the district court never made a finding on that. I understand that. But you have to have some evidence, and I see no evidence. Your expert, Perez, was excluded in part because he admitted he wasn't qualified in oil law, hydrocarbon law, or administrative law. And all he said other than that was that the oil minister had broad authority. He did not say, as I recall, that he had authority to convey the assets of a wholly owned corporation without a resolution of the board of directors or without an act of any officer of that wholly owned corporation. The point I would make for your Honor's consideration is that the real question is, what is the law of Venezuela? It's not whether this expert could testify or did testify about it. It's what the law of Venezuela is. That is what the court has to find. And I think the cases are quite clear that that is the court's obligation, and the court has an obligation to look at all the law and not simply look at what experts say. I thought with respect to foreign law it was a matter of evidence. I think it's a matter for the court to decide, Your Honor. I think you'll find that the authority is that as a matter of foreign law, that is a question of law for the court and that the court can consider any sources and including on appeal. It's not limited to whatever record was produced. With respect to the issue of authenticity, which I do want to touch on, even the appellants at page 23 of their brief acknowledge that they don't have any evidence that this was a forgery. These were self-authenticating documents. The evidence that was admitted, both from circumstantial evidence and from the testimony of people who were involved with the drafting of the trust agreement, established its authenticity. Additional evidence of authenticity was excluded. They excluded the testimony, for example, of Mr. Copernello on the grounds of the advocate witness rule, which simply doesn't apply to a bench trial. He had personal knowledge of it, and that was excluded. But I think the key point is under Rule 901A, all that is required is some competent evidence in the record to support authentication. It was authenticated in the record by two participants. Mr. Copernello's testimony was excluded. There was ample circumstantial evidence in the form of exhibits, which contained emails with drafts of the trust among the parties that demonstrated that it was exactly what it purported to be. Did any of those emails show copies to either Martinez or Munoz? To Munoz, I'm not sure about Martinez, Your Honor. And Martinez is really the significant one, is he not? Because he is the only signatory who purports to convey the assets. He is very significant, Your Honor, I agree with that. But the reason Munoz would have been involved is because he was the Attorney General and he was involved in the drafts. The drafting of the trust by the Attorney General demonstrates that it is what it purports to be. There is a separate question of authority, which you correctly pointed out. But in terms of authenticity, that this was actually a document that was signed by these people and drafted by these people. I just respectfully suggest that given the circumstantial evidence in the record and the APA steals that were later signed and the ratification by Pettivesta later, there can't be any doubt that this was an authentic agreement. I agree with you that we still then have to go to the issue of active state and ask whether that solves the authority problem. But in terms of authenticity, I just respectfully suggest that the evidence is overwhelming. And the district court never reached a question of whether this could be authorized under Pennsylvania law. All right, Mr. Boies, thank you very much. You've saved your time for rebuttal. Thank you very much, Your Honor. Mr. Bierenbaum. Good morning, Your Honors. May it please the court. Bruce Bierenbaum from Paul Weiss, Ripken, Wharton & Garrison for the Glencore appellees and all the appellees on this appeal. This case is brought by a trust purportedly created and controlled by Mr. Boies' law firm, which will receive two-thirds of the recovery to be shared with his litigation funder and their investigator. The district court properly dismissed the case on standing grounds because it found that appellant had not met its burden of proving a lawful assignment. The district court dismissed the case after a recommendation from a magistrate judge who was fully immersed in the matter, who held nine discovery hearings, issued eight discovery orders at a two-day full evidentiary hearing, and that was followed by de novo review in the district court. Mr. Bierenbaum, let me interrupt you for a second. This is Judge Jordan. Yes, sir. The district court found that the trust agreement had to be excluded and was not properly authenticated because of the lack of competent testimony with regards to the signatures, right? Correct. There is case law from other circuits. I don't think we've addressed the issue, but there's case law from other circuits, including the Sixth Circuit, that says that whether or not a signature is authentic goes to the content of the document and to weight, not to whether the document is what it purports to be for purposes of authenticity under the 900 series. The case I'm looking at is just one. It's called United States v. Calamon. The citation is 541F3-624 from the Sixth Circuit in 2008. How do you respond to that sort of an analysis about the legitimacy of a signature and the contention that the question of genuineness goes to content and weight but not to authenticity? Your Honor, obviously I haven't read the Calamon case, but it's important in this case to recognize that the document at issue for authentication is an operational document. It's not simply one piece of evidence. It is a document that, if admitted, purports to be a legal freestanding document that transfers claim. In that situation, I think it's critically important that the authentication rules be applied rigorously. In this case, Your Honor, despite what Mr. Boyce said, there was no evidence that Mr. Martinez, in particular, ever signed this document. Without his signature, there can be no transfer. But this is a document that doesn't have one signature. It has multiple signatures. And you've got competent evidence, at least for authenticity purposes, that some of the signatures were genuine and legitimate. Why isn't that enough to get you past the authentication hurdle? Your Honor, I have two responses. One, if the Martinez signature is not authentic and genuine, there can be no assignment. Well, let me ask you this hypothetical. It's a very different case, and I know it doesn't govern here, but let me ask you this hypothetical. You've got a case where there is a contest regarding a will and a subsequent will. And the contention about the subsequent will is that the person who later became deceased didn't really sign it. And there's a genuine dispute about the authenticity of the signature on that second document. In that sort of a scenario, doesn't the genuineness of the signature on the second will become an issue of fact for the trier of fact? Your Honor, it is an issue of fact for the trier of fact. And in this case, the magistrate judge, with review by the district court, considered that issue fully after an evidentiary hearing. But it's an excellent example that Your Honor has raised because that's precisely why in most states, most trust in the state statutes require extra notarization and or certification for signatures on a will, including witnesses. Precisely for that reason. And that's exactly the case here. In fact, Your Honor, there was not a single witness with personal knowledge of a single signature on this trust agreement. Not Mr. Munoz, not Mr. Martinez, not the trustees. Not a single piece of evidence was introduced on any of those. And to be clear, Your Honor, the FLEs went out of their way to get the evidence on these signatures. It's not as if we were trying to slip one by here. We asked for the depositions of anyone and everyone who could have any personal knowledge. And we got not a single witness who had any personal knowledge that Mr. Martinez signed this document. Anyone could have signed the document. There were no documents, affidavits, apostills from the U.S. trustees? The U.S. trustees submitted after the fact notarizations. What does after the fact mean? After what? The trust agreement was signed in the summer of 2017. There were no apostills or any kind of notarizations. Right, but a year later they came up with notarizations for the U.S. trustees. But not for Mr. Martinez and not for Mr. Munoz. Well, this may not get them there, but there is evidence in the record that the U.S. trustees' signatures were genuine and legitimate, right? You may not agree with it. You may think it's not appropriate. You may think it doesn't carry the day. But there is some evidence in the record concerning the U.S. trustees and their signatures, is there not? There is the after the fact notarization of those two signatures.  You need Mr. Martinez's authority to lawfully transfer the claims. And to answer Judge Anderson's question, the Dunhill case in the Supreme Court makes clear that the court needs to look into the authority of the actors to apply the active state doctrine. But Your Honor, I'd like to spend a moment on the Champerty issue because it's a critical issue that really is very straightforward and makes it easy for the court not to have to delve into these evidentiary issues. The Champerty finding below was that this transaction was prohibited by the New York Champery Statute 489, which explicitly prohibits the assignment of claims with the intent and purpose of bringing litigation. This case is on absolute fours with the New York Court of Appeals case in Justinian. It's absolutely in the bullseye. The situation here is that Pettivesa supposedly had claims, but it did not wish to sue directly. So it purported to assign those claims to a created for litigation trust. That's exactly what happened in Justinian when the note holders did not want to sue the German banks directly, so they assigned their claims to a created for litigation trust. Similarly, in both cases, the trust had no pre-existing relationship with Pettivesa, exactly the same as Justinian. In fact, the Champerty statute is directed at exactly what happened here, which is a situation where lawyers and investigators stir up litigation for which there's no evidence litigation would have been brought otherwise. It's classic commercialization of claims, and that's why it's barred by Justinian. And the court can easily affirm on that basis. We think that is controlling under Justinian. The only case that appellants cite on the Champerty point is Love Funding, which, by the way, is a trust case. And Love Funding really proves our point. In that case, the trust to which the claims were assigned was a pre-existing trust that actually held the rights to the collateral in the notes involved. So it was very much a sister entity. In this case, that cannot be said. In fact, Mr. Boies and his firm went out of their way in discussing this in their papers to say that the idea was to separate this trust from the government of Venezuela. So, your honors, we think that the court can affirm the district court ruling on Champerty quite easily. On the authentication issue, which we... Well, let me... Mr. Birnbaum, let me ask you this procedural question. Yes, sir. That Champerty ruling is a merits ruling, is it not? A merits ruling on Champerty, yes. Right, so because we're not allowed to engage in hypothetical jurisdiction, we have to either resolve the standing question or the act-of-state question or the political question doctrine matter before we get to Champerty, right? No, I don't agree with that, your honor, because jurisdiction here turns on whether this plaintiff has standing. Right, so we have... Before we get to Champerty, we... To get to Champerty, we have to find that they have standing, do we not? But Champerty goes to the issue of whether they have standing. No, it's a sub... I think it's a substantive issue under New York law that New York law just doesn't recognize this cause of action and deems it against public policy. It doesn't mean you don't have standing, it just means you don't have a cause of action. And that to me sounds like merits as opposed to justiciability. Well, your honor, I think we see it differently. The... In order to have standing, the trust has to have an assignment, a lawful assignment. That was the question for the hearing. Yes, I agree. And if the assignment is unlawful under New York law, then there is no lawful assignment and no standing. I think you're confusing merits with justiciability, because standing has to assume the correctness of the plaintiff's legal claim. You don't address merits within the rubric of standing. You don't say, oh, you can't prevail because you're never going to be able to show that a law is unconstitutional or that the defendant acted tortiously. And if you can't show that, you can't show injury and you can't have standing. In my opinion, that's not the way standing doctrine works. The merits are separate from the justiciability question. Am I wrong about that? I respectfully disagree with that, your honor. This doesn't obviously go to the merits of the claims in this case. It goes to the merits of whether this plaintiff has standing, and there's a full evidentiary hearing on that issue. You could describe that as a merits ruling. Judge Anderson has a question that might be relevant here. I think perhaps your answer to Judge Jordan's question might be that under New York law, the trust is void. And because the trust is void, there is no assignment. And without an assignment, the trust has no standing. Well, it says it far more elegantly and clearly than I attempted to do, your honor. Except, except, so let me play devil's advocate to my colleague, Judge Anderson, who knows a lot more about everything than I do. I dispute that. But the trust itself is not void. It's the assignment to the trust in this case that's void, right? Well, either one would void the assignment, and the standing in this case depends entirely upon the assignment. Okay, you've got it teed up, Mr. Barenboim, so fire away. Thank you, your honor, and I think you know our position on that. There are several other grounds, alternative grounds, that the district court ruled on. I won't address those unless the court has questions, but I will address for a minute the active state doctrine. The active state doctrine only applies to official acts of foreign government officials or foreign governments that take place fully within its borders. There's no dispute here that this agreement was not consummated fully within the borders of Venezuela. In fact, the agreement itself in Article 9.1 says that it shall become effective as of the date it is fully executed and delivered. And as was pointed out earlier, the U.S. trustees signed this agreement outside Venezuela, and that's when the agreement became effective. Moreover, by making the agreement subject to New York law and New York dispute resolution and all of those things, the agreement itself was clearly taken out of a solely Venezuelan jurisdiction and subjected to New York laws. We think for that reason as well, the active state doctrine doesn't apply. We already talked about the fact that plaintiffs did not meet their burden at all in showing that this was an official government act if they were required to do under Dunhill. And moreover, it is quite relevant to the active state question that both the United States government and the current Venezuelan government condemn this trust, say it's unconstitutional, say it's of no force and effect. In the Marcos case and the Bishio case, both speak to instances where there was a change of regime, and that goes directly to the issue of whether the involvement of the court in looking at this assignment threatens an embarrassment to the U.S. government. We think that in this case, there is no threat to the U.S. government by this court looking at this assignment and agreeing with the district court below. The Spirits International case, which plaintiffs, which appellants rely on, is really quite different. It was wholly within Russia among government agencies. Lastly, your honors, to address the political question argument, the political question argument is really the flip side of the active state argument. The cases counsel the court to look very, very carefully at whether actions of the judiciary are impinging on the executive branch. In this case, you have an executive branch which has recognized the new government, the old government, and the old president has been indicted. We have a letter, we'll address that next week, but we have a letter from the new government condemning this trust arrangement. We have a National Assembly of Venezuela which has condemned this trust arrangement and called it unconstitutional. For this court to permit, to reverse and permit this case to go forward is a classic example of putting the courts in an embarrassing situation with the executive branch. The correct decision here, which is what the district court did below, is to dismiss on standing, not involve the courts in this case. I would just note, in closing your honors, that these claims still remain in the hands of PDVSA if this case is dismissed. Mr. Berenboim, one more question. When you address that letter along with Mr. Boies shortly, you may want to take up the issue of authenticity. Given all that's happening with the dual Venezuelan governments right now, how are we satisfied that this letter is genuine, that it's authentic, and how do we know that it purports to speak for President Guaido? You may want to take up those issues along with Mr. Boies in your written response. Thank you very much. Thank you, your honor. I'm not surprised that you asked that question. Thank you, your honors. Okay, Mr. Boies, you've got your rebuttal time. Thank you very much, your honor. May it please the court, my name is David Boies. Let me address the authenticity point first. Counsel says that they went out of their way to seek discovery and depositions. First, we offered depositions, and this is all in the record and all in our briefs. We offered depositions of the U.S. trustees. They refused. We presented evidence that the U.S. trustees had actually signed the document. That goes to the authenticity of the document. We offered a deposition of the people in Venezuela, either by video or by written questions. They were not able to come to the United States. However, we offered video depositions of them in Venezuela. We offered to make them available for depositions on written questions. The defendants refused that. Did those individuals who were outside of the United States submit affidavits or anything else indicating that they had signed the documents? We had an apostille from Moonrose. We were not able to get anything from Mr. Martinez because shortly after the trust was signed, Mr. Martinez was taken into custody, and we were not able to get any affidavit from him. All right, thank you. This is a question from Judge Anson. Is not the fact that Martinez was arrested, I assume, by the Maduro government, but the charges were that he was involved in corruption, signing in unauthorized manner with respect to affiliates of this very oil company. Does that not cast some doubt on his authority and on his authority to sign for this company? No, Your Honor, I don't think that's accurate. Why? He was not charged with anything to do with the signing of this trust and with respect to what he did sign for. He was not charged with doing something that he was not authorized to do. He was charged with doing something that he was authorized to do, but for an improper purpose, i.e., for corrupt purposes. Also, we submitted exempt bars of Martinez's signature for examination. We preserved a handwriting expert that the court declined to credit. The magistrate judge declined to credit. But the exemplars are in the record, and we referred to those in the brief. So there was substantial evidence that this was Mr. Martinez's signature. There was no evidence that it was not, and there was considerable evidence that the trust itself was authentic. With respect to the Champerty argument, first, the Champerty section only applies to collection agencies, corporations, or associations. That's absolutely clear from the text of the statute. The trust is obviously not a collection agency, is not a corporation, and is not an association. Later in that very statute, it refers to trustees. Yes, but a trustee... Which makes me think that the statute, when it referred to associations, does include trusts. But, Your Honor, you can have, for example, a trustee of a minor child. You can have a trustee of an incompetent. You can have a trustee of a bankruptcy estate. There are lots of trustees that are not trustees of a trust. In addition to that, there are so-called business trusts that are associations, and business trusts are defined under New York law as trusts that have certificates, like stock certificates, that are freely tradable. That obviously does not apply to this kind of trust. Second, the statute does not apply to liquidating trusts, and by its terms, this is a liquidating trust. In addition, and this is one of the reasons that I started out where I did on the facts, it's not champertry if you are assigning this for some purpose, some significant purpose, other than simply to try to collect it. And the purpose of this trust, and the evidence in here, the reason that you had a trust, was not that Pentevest did not want to do this by itself. It was to try to remove the control over the trust, the ability to kill the lawsuit from the government. It was not to separate the economics. The sole beneficiary of the trust is Pentevest and the Venezuelan people. What was separated was the ability to try to kill the trust, because everybody was concerned that the people who were engaged in the corruption would use their political influence to try to get one faction or another to try to kill this litigation. The evidence is undisputed that that was the purpose of setting this trust up. From an economic standpoint, whether Pentevest entered into an engagement letter or the trust entered into an engagement letter, it was going to be the same law firm and the same arrangement. The difference is that by putting it in the hands of independent trustees, these aren't controlled by our law firms, these are independent trustees, established business people, that meant that Venezuela or Pentevest or any new political faction, in response to corrupt attempts to bribe and stop this, couldn't do that. That was the purpose of this, and that takes it outside of the Chaplaincy Statute all by itself. You've got about a minute left, Mr. Boyce. With respect to whether this was fully within the borders of Venezuela, the transfer, and this is what the spirits alcohol case says, it's not where it's going to be litigated, it's where the transfer takes place. The transfer takes place when these people are signing away in Venezuela the causes of action. That took place entirely within Venezuela, that was entirely an act of state. I take the court's point that the court needs to make a determination of whether these were people who had the authority to do that. The district court did not do that, and we believe that the evidence in the record, and the evidence that's available from the statutes, if the court decides that this is a question of law, would demonstrate that these were the people that had the authority to do that. But what's important is that it's the authority of the government, not just the authority of PDVSA, it is the authority of the government to make a decision. If the government makes a decision, if the Maduro regime, at that time the sole exclusive legitimate regime of Venezuela, makes the decision that this is the way it can be transferred, that is a decision that the United States courts, under the act of state document, we respectfully suggest are not authorized, and not appropriate for them to second guess. All right, Mr. Boyce, thank you very much. Thank you, Mr. Birnbaum, we appreciate the arguments. Thank you very much, your honor.